George Pillersdorf v. Commissioner.
Pillersdorf v. Commissioner
Docket No. 22221.
United States Tax Court
1950 Tax Ct. Memo LEXIS 184; 9 T.C.M. (CCH) 444; T.C.M. (RIA) 50137; June 5, 1950
*184 Arthur A. Miller, Esq., 978 Union Commerce Bldg., Cleveland, O., for the petitioner. Cyrus A. Neuman, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in petitioner's income tax liability for the taxable years 1943, 1944, and 1945 in the respective amounts of $139.08, $2,265.09, and $4,120.78. The year 1942 is also involved because of the provisions of the Current Tax Payment Act of 1943. The questions presented for decision are whether the petitioner is taxable for income which was reported by his wife as her distributive share of the income of two partnerships; i.e., whether petitioner and his wife were partners in two ventures. Other assignments of error raised in the petition were abandoned by the petitioner at the hearing. The petitioner filed his returns with the collector for the eighteenth district of Ohio, at Cleveland, Ohio. Findings of Fact Petitioner, George Pillersdorf, and his wife, Estelle Pillersdorf, are residents of Cleveland, Ohio. They were married in 1928. The petitioner is an attorney. He was admitted to the bar in 1926. Prior to the years here in question, *185 petitioner's earnings from his law practice had been small. Estelle Pillersdorf, prior to her marriage, was a secretary, and had had some business experience. Edith Forschner, a cousin of Estelle Pillersdorf, came to the United States with her husband, from Czechoslovakia, in 1939, where they had operated a large shoe manufacturing business. They succeeded in bringing to this country a substantial portion of their capital. Soon after their arrival, the Forschners established a shoe manufacturing factory in Brooklyn, New York, which Edith Forschner operated, and they established another shoe manufacturing factory in New Jersey which her husband operated. The Pillersdorfs and the Forschners have been close friends, and have spent considerable time together since the Forschners have been in the United States. For many years petitioner and his wife were anxious to increase their income, in order that, particularly, they could accumulate funds for the education of their two children in universities. Petitioner's wife frequently discussed this problem with Edith Forschner, whose ability to make money had been proven. On several occasions Edith urged Estelle to try to establish some *186 business to supplement the family income. In 1943, Edith advised Estelle to look for material which would be used as a substitute for leather soling on nonrationed house slippers and play shoes. Edith's factory, the Cosmos Footwear Company, was manufacturing such types of footwear. There was a shortage of leather at that time and during the war period. Edith told Estelle that if she succeeded in finding materials suitable for soles of nonrationed shoes, the Cosmos Footwear Company would purchase as much of such soling material as could be obtained. Estelle discussed the idea with petitioner, and, although he was doubtful about the possibility of obtaining substitute material, and hesitated taking time from his law practice, he agreed that it was worth while for them both to spend some time on the proposed venture. Estelle obtained a list of manufacturers of rubber, composition, and plastics, who might be able to supply the substitute materials for use as soles for shoes, and sent letters to all of the possible soling suppliers whose names she had obtained. Due to war time shortages, the inital efforts were fruitless. But Estelle continued her search and discovered that the Quaker *187 Rubber Company of Philadelphia had recently established a Cleveland branch. She and petitioner called upon the branch manager, but they were unable to persuade him, at that time, to give them any material. In November of 1943, Russell Stanley, the production manager of the Quaker Rubber Company plant in Philadelphia, arrived in Cleveland. Estelle and petitioner went to see Stanley, but he insisted that he could sell them nothing because the Quaker Rubber Company had difficulty in supplying regular customers and, moreover, the company had never manufactured shoe soling material. Petitioner's wife noticed a roll of rubber belting and told Stanley that she was sure that this material could be used as shoe soling. Later, Stanley advised the Pillersdorfs that he would sell them some of the rubber belting, but that they would have to give the Quaker Rubber Company a certified check for the price of $2,269 before the material would be shipped, due to their lack of any business credit rating. Estelle telephoned Edith Forschner who told her that the Cosmos Footwear Company could use the rubber belting for shoe soles. At this time, the petitioner's bank balance was around $1,900, and a substantial *188 portion represented funds belonging to petitioner's clients. Jacob Roodman, Estelle's father, had been advised of her efforts to obtain a source of supply of substitute materials for shoe soling. Roodman had told his daughter that he would lend her up to $5,000 to get her started in business. On November 3, 1943, the date upon which Stanley offered to sell Estelle and petitioner $2,269 worth of rubber belting, Estelle called upon her father for financial assistance. In order to make it possible for petitioner and his wife to pay for the first shipment of materials, Roodman loaned $1,000 to his daughter on a note signed by her alone. A partnership agreement between petitioner and his wife, in which they agreed to do business under the name of the Eton Company, had been executed on that same day, but no bank account for the Eton Company had been opened. Roodman made his check for $1,000, drawn on The American Savings Bank of Cleveland, Ohio, payable to petitioner and then accompanied petitioner to that bank where the $1,000 in cash was obtained. This cash was then taken to the National City Bank of Cleveland and deposited in petitioner's personal account. The additional cash made it *189 possible for petitioner to obtain the certified check for $2,269, which was turned over to the Quaker Rubber Company. The goods were shipped to the Cosmos Footwear Company, and a check for $2,800, dated November 4, 1943, was forwarded to pay for the materials. Petitioner's father-in-law was anxious to be sure that his daughter would definitely by a partner in the new business. Since he had some of the wariness of laymen about legal documents, such as the partnership agreement which petitioner and his wife entered into, petitioner's father-in-law asked petitioner to write a letter to his wife expressing in plain English the details of the new venture. Petitioner wrote the letter as follows: "November 3, 1943 "Dear Estelle: "Some weeks ago Cosmos Footwear Corp. explained to me that they were having great difficulty in obtaining a supply of material for shoe soles and asked me to investigate in Akron and other places to see what I could do for them. Other manufacturers are having the same trouble. If I can find a source of material that will suit this purpose I can develop a nice business. "During the past few weeks I have tried many places and can see that this is a tough nut *190 to crack. But I think I will now be able to do something. Today I spoke to Mr. Stanley of Quaker Rubber Corp. who said that if I would see him tomorrow he would give me an answer as to whether his firm can supply me. Some other manufacturers I have contacted may be able to sell me in the near future. "I am not certain I can sell all the material I can buy. It will not be necessary to carry any stock as it can be shipped direct from the factory to shoe manufacturers. The thing that bothers me is the fact that I need some capital in the event I can buy the goods. Each order runs into thousands of dollars. As I have never engaged in business I have no commercial credit rating and cannot expect credit terms but will have to pay cash. On the other hand the manufacturers to whom I will sell are wellestablished firms and I will have to extend to them terms of at least ten days and maybe thirty days. "I explained this entire situation to your father today and asked his assistance as I want to know where I am at when I talk to Stanley tomorrow. Dad's earning days are over and I realize that he can't afford to take any wild chances with the money he has. As the title to our home is in your *191 name he would be secured if he loaned money to you on your note. "Dad and I worked out the following proposition: You and I will become partners under the name of The Eton Company for the purpose of dealing in sole material and any other goods we agree upon. Each of us will contribute an equal amount of capital. Dad will loan you up to $5,000.00 to cover your contribution and you will give him your note. "It will be necessary for me to go out of town sometimes. In that event you will have to spend some time at my office in order to take care of things. Also you can help by taking care of the correspondence and the bookkeeping. "This business has wonderful possibilities and if it works out I will give up the law and we can devote full time to it. "If this proposition is agreeable to you please sign this letter. "Sincerely, "George. "O.K. - Estelle." After November 3, 1943, there were several weeks of uncertainty during which petitioner and his wife did not know whether the Quaker Company would agree to make any more shipments. However, after communicating a number of times with Stanley and seeing him in the East, they finally received his promise on November 23, 1943, that *192 additional supplies would be forthcoming. On November 24 they opened the Eton partnership bank account. Both petitioner and his wife were authorized to sign checks, although in practice petitioner drew all checks for the company. As a condition precedent to further shipments, the credit department of the Quaker Rubber Company demanded that the Pillersdorfs leave $4,000 on deposit with the company to insure advance payment for all merchandise shipped. Not having the required $4,000, the Pillersdorfs again turned to Jacob Roodman, who loaned another $1,000 to his daughter on her personal note. Neither of the two notes given by petitioner's wife to her father have been paid, but they were included in Jacob Roodman's estate at the time of his death and listed as assets in the final accounting of Jacob Roodman's executrix on July 1, 1947. During the following weeks petitioner's wife constituted the entire office force of the Eton Company. Among other things, she handled all the invoices to the Cosmos Footwear Company. After the Eton partnership had been in existence for some time, the Pillorsdorfs sought to obtain new suppliers of shoe soling so that they would be in a position to *193 take on new customers. Up to this time Cosmos Footwear Company had of necessity been the only customer because the Quaker Rubber Company had refused to make avilable to the partnership materials other than those necessary to supply Cosmos. During a visit with Jack Rosenthal and his wife, who were social friends, the Pillorsdorfs discussed with them the possibility of obtaining an additional source of substitute shoe soling. Rosenthal had been connected formerly with the Maisel Tire Company of Cleveland, Ohio, which had extensive connections with Akron rubber interests. Rosenthal informed the Pillersdorfs that he would be able to secure a supplier of materials, but insisted upon becoming a partner in the business venture if he succeeded. Petitioner and his wife discussed the Rosenthal proposal at length and finally decided to give the Rosenthals a partnership interest, limited, however, to any additional business that would accrue as a result of being able to obtain new materials. Petitioner and his wife advised Rosenthal that the Eton partnership would remain the sole property of the Pillersdorfs, and that the new partnership to be organized would use materials supplied by the Rosenthal *194 contact and would obtain its own customers. After this agreement the Rosenthals and the Pillersdorfs met with representatives of the Ace Rubber Company of Akron, Ohio, who agreed to ship substitute soling material to the new business. The new partnership was organized on June 24, 1944. It was originally called the Cleveland Products Company. Due to the objections of another firm having a similar name, it was changed to Pilro Company. The total capital contributions of Rosenthal, his wife, petitioner, and his wife aggregated $12,000, $3,000 from each. Both petitioner and his wife acquired their necessary $3,000 by withdrawing $500 each from the Eton partnership on September 15, 1944, and $2,500 each from the Eton partnership on May 11, 1945. Petitioner's wife rendered substantial services for the Pilro Company. She and Jack Rosenthal constituted the entire office force of Pilro; she also did some of the work in connection with acquiring new customers for Pilro. During the years 1943, 1944, and 1945 petitioner's wife withdrew a total of $8,936.36 from the Eton partnership, of which $3,000 represented her capital contribution in Pilro. The excess, plus $8,933.76 which she withdrew *195 from Pilro, was used by petitioner's wife to pay her income taxes, to purchase with her sister a large apartment house, to reduce the mortgage on the family home, which was in her name, and to pay taxes and other expenses on that home. She also took a 60-day pleasure trip to Florida and two trips to a resort at Martinsville, Indiana. Petitioner, in good faith and acting with a business purpose, intended to join together with his wife as partners in the conduct of the Eton Company. Petitioner in good faith and acting with a business purpose, intended to join together with his wife and the Rosenthals as partners in the conduct of the Pilro Company. Opinion This case presents two issues involving the same question for our determination: First, whether Estelle Pillersdorf may be recognized as a partner with her husband in the Eton partnership during the taxable years and, second, whether she may be recognized as a partner with her husband and certain others in the subsequent Pilro partnership during the taxable years. The Commissioner has determined that Estelle Pillersdorf's alleged status as a partner in each of these partnerships lacked validity for Federal tax purposes, and *196 consequently he taxed income attributable to her to her husband, the petitioner herein. Issue 1. A wife may be a valid partner with her husband. See, , and . Such purported partnerships are subject to close scrutiny, however. The determination of whether petitioner's wife should be recognized as a partner for tax purposes depends upon whether the parties really and truly intended to carry on business in partnership. Or, as the Supreme Court said in : "* * * The question is whether, considering all the facts - the agreement, the conduct of the parties and execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of the income and the purpose for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Having *197 given consideration to all of these factors, we think the petitioner has established that he intended to join together with his wife in the conduct of the Eton partnership, and we have so found as a fact. For it is uncontradicted in the record that Edith Forschner first communicated to petitioner's wife the concrete suggestion for a specific business, namely, finding material as a substitute for leather soling on non-rationed slippers and play shoes then being made by the Forschners' shoe company. Thereupon it was petitioner's wife who convinced him that the idea was worthy of the effort in spite of the fact that war shortages in all materials made success unlikely. From that point on, petitioner's wife worked with petitioner at each step of the way, and she discovered the source for these much needed materials. Moreover, when the need for funds arose to make purchases, it was Estelle who supplemented the petitioner's meager resources by securing a loan from her father on her personal note, and, indeed, it was only on the condition that Estelle be made a partner in the proposed venture that her father agreed to make available the necessary funds. Thereafter, when the Eton partnership *198 had been formally entered into, Estelle again secured moneys from her father on her personal note to provide the required additional resources to make possible a continued source of supply from the Quaker Rubber Company. And Estelle continued to contribute clerical and some executive services to Eton throughout its existence. Petitioner's wife exercised complete control over her share of the earnings of the Eton partnership. Her drawing account in Eton shows that petitioner's wife withdrew $5,936.36 during the years 1944 and 1945, above and beyond the $3,000 which she withdrew during those years to invest in the Pilro partnership. There is nothing in the record to indicate any exercise of control by petitioner over these amounts withdrawn by his wife. She used these funds, along with moneys withdrawn from Pilro, to purchase, with her sister a large apartment house, and to pay taxes and other expenses, including reduction of the mortgage, on the house which was in her name. Since petitioner's wife contributed to the capital of Eton and rendered vital services throughout the life of the partnership, it is concluded that Estelle Pillersdorf was a partner with petitioner in the Eton *199 partnership. It is held, therefore, that the Commissioner erroneously included in petitioner's income during the taxable years the income of the Eton partnership which was the share of petitioner's wife in the earnings of the partnership. Issue 2. As to the Pilro partnership, which consisted of petitioner and his wife and Rosenthal and his wife, it has been found as a fact that the parties intended to join together as partners in the conduct of a business. The second partnership came about as a result of the efforts of petitioner and his wife to discover sources of supply other than the Quaker Rubber Company. It is unnecessary to restate the facts. Petitioner's wife attended the conferences which resulted in the formation of the Pilro partnership, and she contributed $3,000 to the capital of Pilro. Petitioner's wife took an active part in the conduct of the business of Pilro. It is held that petitioner and his wife were partners in the Pilro partnership, and that the respondent erred in including the share of petitioner's wife in the earnings thereof in the income of petitioner for the taxable years. Decision will be entered under Rule 50.